THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, RESPONDENT, v. THE CUNARD STEAMSHIP COMPANY (LIMITED), APPELLANT

*Wharves and bulk-heads in New York city — lease of one side of a pier for the erection of a ferry rack and the water for ferry purposes — building of a shed on piles in the slip — an action will lie to abate the nuisance — that the city has permitted such erections in other slips is not a defense.*

An action can be maintained by the city of New York for the removal of a shed constructed upon piles sunk in a slip between piers in the Hudson river; and in such an action the defendant may be restrained from maintaining the shed, and be directed to remove it.

A resolution of the dock department of the city of New York, passed April 26, 1876, agreeing to lease the northerly side of a pier to be constructed by it for the purpose of erecting a ferry rack, and the use of the water upon said side for ferry purposes, does not confer a right upon the lessee to erect a shed in the slip upon that side, covering a space therein of some fifty by ninety feet, and supported upon piles.

If, from the terms of such a resolution, it could be assumed that the department intended to grant such a privilege, it would be an act unauthorized, and in conflict with section 6 of chapter 574, Laws of 1871, relative to changing the bulk-head line upon the western side of said city, and to the construction of an exterior street.

The plans for the improvement to be made under said act did not contemplate the appropriation of any part of a slip between piers for driving piles into the earth and erecting a shed upon said piles.

The theory of said act is consistent with former legislation upon this subject, as appears from chapter 80, Laws of 1798, and chapter 763, Laws of 1857.

The fact that both the city and its dock department had permitted ferry companies using other slips to incumber them by similar structures is not a defense to an action brought to secure the removal of such a shed as an illegal structure. The statute of 1871 is imperative.

In such an action the court will not inquire whether, if the above rule be enforced, it will prevent the operation of any ferry from the western shore of said city.

Appeal by the defendant, the Cunard Steamship Company (Limited), from a judgment, entered in the office of the clerk of the city and county of New York on the 13th day of February, 1890, which forever restrained and enjoined the said defendant from using, occupying or maintaining a shed, now existing between Piers 40 and 41 (new numbers), in the North river, immediately to the westward of and adjacent to the wharf or bulk-head between said piers, and to the northward of and adjacent to the northerly side of pier (new) No. 40, North river, and directing the said defendant to remove the same in order to afford free access for vessels to the wharf or bulk-head between said piers, to which it is now adjacent.

The trial of the action was had at the New York Circuit before the court.

*George De Forest Lord*, for the appellant.

*D. J. Dean*, for the respondent.

Daniels, J.:

The action was brought to secure the removal of a shed erected upon the northerly side of new pier No. 40, extending from the westerly side of West street a distance of about 570 feet into the Hudson river. The easterly end of the shed was upon the new bulk-head line, forming the westerly line of West street, and being 250 feet west of the easterly line of that street. The shed extended about fifty feet westerly along the pier line from the bulk-head, and in a northerly direction for a distance of about ninety feet, occupying in that manner one-half the space between pier Nos. 40 and 41. It was erected upon piles driven in the slip west of the bulk-head, and was used by the defendant as a depository or warehouse for goods received to load upon its steamers, and also for goods unladen from those steamers. Its right to maintain the shed in this manner was derived under a resolution of the dock department of the city of New York passed on the 26th of April, 1876. This resolution provided:

"That the Central Railroad of New Jersey be, and they are hereby informed that this department will grant a lease to the said corporation for a term of ten years, of the northerly side of a pier

to be built, wholly or in part, upon the premises now occupied by Pier 48, N. R., for the purpose of erecting thereat a ferry rack, as soon as the pier shall be constructed or completed by this department, in conformity with the new plans adopted, or to be adopted, for the improvement of the water front, at a yearly rent of $7,500, but it is understood that the said corporation shall have no right to the use of any portion of the surface of said pier; the department reserves the right to rebuild the said pier and the bulk-head wall contiguous thereto, at such time as it may by said department be deemed expedient; and, further, that until the department shall take possession of the said Pier 48, for the purpose of rebuilding, the said Central Railroad of New Jersey shall pay to this department for the use of the whole of the L on the north side of said pier, and for the use of the water adjacent to said north side, for ferry purposes, rent at the rate of $5,000 per annum; but it is understood that the said corporation shall have no right during such period to the use of any portion of the surface of the said pier, excepting that of the said L provided that the said Central Railroad of New Jersey shall, within five days after the receipt of this notice, file in this office its acceptance in writing of the terms hereof, and agree to execute a lease containing the usual covenants and conditions, and in conformity with the terms herein set forth, for the northerly side of the pier when so rebuilt and ready for occupancy." An additional resolution was adopted on the 21st of June, 1876, by the same board, giving permission to the Central Railroad Company of New Jersey to drive piles in this slip adjacent to the north side of the old pier, then known as Pier 48, and to erect thereon a platform and ferry-houses, together with such other structures, racks, bridges, etc., as might be necessary for use of a first class ferry, and then in the course of erection. The company continued to use the slip for the purposes of its ferry until sometime in the year 1878. And on the 1st of November, 1880, the railroad company and its receiver executed an assignment to the defendant by which "the parties of the first part, in consideration of the sum of one dollar to them in hand paid, and other good and valuable considerations, have granted, bargained, sold, assigned, transferred and set over, and by these presents do grant, bargain, sell, assign, transfer and set over to the said party of the second part, all rights and privileges to

which they the said parties of the first part, or either of them are in any way entitled under or by virtue of a certain resolution of the board of commissioners governing the department of docks, passed at a meeting of said board, held on the twenty-sixth day of April, one thousand eight hundred and seventy-six, a copy of which is hereto annexed; and also any lease made by the said department of docks, to the said parties of the first part or either of them, pursuant to said resolution, and the said parties of the first part hereby request the said the department of docks to substitute the said the Cunard Steamship Company (Limited), as lessees in any lease to be made under or pursuant to said resolution."

And on the tenth of the same month the dock department, by a resolution, assented " to such substitution, and hereby agrees to grant a lease of the premises referred to above, and now known as the northerly side of Pier (new) 40, North river, but no right to the use of any portion of the surface of said pier for a term of 8 years and 6 months from November 1st, 1880, to the Cunard Steamship Company (Limited), at an annual rent of $7,500, payable quarterly in advance, and to contain a covenant for a renewal term of ten years at an annual rent of $7,625, provided that the said steamship company shall, within ten days from the receipt hereof, file in this office its acceptance in writing of the terms hereof, and agree to execute a lease containing the usual covenants and conditions, and in conformity with the terms herein set forth, when notified so to do by this board;" the terms of which were accepted by the defendant on the fifteenth of the same month. After the resolution of the 26th of April, 1876, the department removed the shed which had been erected by the railroad company and rebuilt the pier as well as the bulk-head, locating the bulk-head about one hundred and eighty feet westerly of the preceding bulk-head, which was seventy feet westerly of the easterly side of West street. And after the removal of the shed and the completion of the new pier, it restored so much of the shed as still stands upon the piling, and is occupied and used by the defendant.

In support of the action it was alleged that this shed was an illegal structure, and that the plaintiff, under its title and authority, was entitled to a judgment securing its removal for the purpose of enabling shipping to reach and use the bulk-head without

obstruction. An'd the court adopted that view at the trial, and enjoined the defendant against maintaining the shed and directed its removal. And *People* v. *Vanderbilt* (26 N. Y., 287) is a precedent, approved by the Court of Appeals, for this judgment in case the plaintiff is entitled to maintain the action.

By the resolution of the 26th of April, 1876, the northerly side of the pier to be built was leased for the purpose of erecting thereat a ferry rack, and for the use of the water adjacent to the pier for ferry purposes. But the resolution contained no express authority permitting the railroad company to erect the structure now in controversy. That authority was, in terms, given to it for the first time by the resolution adopted on the twenty-first of June of the same year. But there was no assignment by the railroad company to the defendant of the rights or privileges which it was proposed by that resolution to secure to the railroad company. The assignment, on the contrary, was exclusively restricted to the interest intended to be created by the resolution of the 26th of April, 1876, which contained no provision for putting up or maintaining this structure. And the fact that this liberty or right was not secured by the first resolution, but was in terms intended to be delegated by the second resolution, is quite a decisive indication that it was understood by the dock commissioners and the Central Railroad Company that the latter possessed no authority to erect or maintain the structure under the first resolution. If that had not been the fact, then there certainly was no reason whatever for passing the additional resolution of the twenty-first of June. And by the assignment, which was limited to the first resolution, and the lease therein mentioned, the same intention appears to have pervaded the acts of the parties. And that was to give to the defendant the rights and privileges of maintaining the ferry rack and operating the ferry, but nothing substantial beyond that.

But if it had been intended by the resolution of the twenty-sixth of April to permit the erection and maintenance of this structure in the slip, then it was so far unauthorized for the reason that it then came in conflict with section 6 of chapter 574 of the Laws of 1871. This act has since undergone changes by which portions of it have been repealed, but this section was in force at the time when this resolution was adopted, and appears to have so remained

to this time.   And it provided for and empowered the department to adopt plans, subject to the approval of the commissioners of the sinking fund, for this exterior or westerly line of the city, and the extension of this and other piers into the river.   And soon after the passage of this act such plans were adopted and approved by the commissioners of the sinking fund.   And subdivision 3 of this section in that event declared, that the plan so adopted should " be the sole plan according to which any wharf, pier, bulk-head, basin, dock or slip, or any wharf structure, or superstructure, shall thereafter be laid out or constructed within the territory or district embraced in and specified upon such plan, and be the sole plan and authority for solid filling in waters surrounding said city, and for extending piers into said waters and erecting bulk-heads around said city."   And it was further directed in the same subdivision that, " From the time of the adoption of said plan, no wharf, pier, bulk-head, basin, dock, slip or any wharf structure, or superstructure, shall be laid out, built or rebuilt within such territory or district, except in accordance with such plans."   And by subdivision 5 of the same section, " The said board of the department of docks shall proceed, according to said plan or plans, to lay out, establish and construct wharves, piers, bulk-heads, basins, docks or slips in the territory or district embraced in such plan or plans."   And by subdivision 6 of the section it was, in substance, provided that the bulk-heads and slips erected according to the plan, should be used only for the purposes of commercial business by vessels approaching and secured to them in the transaction of that business. In the plans which were adopted and followed in constructing the bulk-head and the pier, there was no appropriation of any part of the slip between the piers for driving piles into the earth, and erecting and maintaining a shed or structure of this description upon those piles.   But the spaces between this and other piers included in the plan were left open, unobstructed and free to be used by water-craft in the transaction of their business.   And the erection of this shed over the water of a slip standing upon these piles was not only in violation of the plan itself, but in contravention of the provisions of the statute already mentioned, forbidding any other use of the water front than that mentioned in the statute.   The theory of the act in this respect characterized the

preceding legislation adopted for the location and regulation of the water front of the city of New York. . An act upon this subject was passed on the 3d of April, 1798, which is known as chapter 80 of the laws of that year. And by that act a similar declaration was made, "That no building of any kind or description whatsoever (other than the said piers and bridges), shall, at any time hereafter, be erected upon the said streets or wharfs, or between them respectively, and the rivers to which they respectively shall front and adjoin." Another act upon the same subject was enacted in April, 1857, and is known as chapter 763 of the laws of that year. And by section 2 of that act it was declared that it should "not be lawful to fill in with earth, stone or other solid material, in the waters of said port beyond the bulk-head line, or line of solid filling hereby established. Nor shall it be lawful to erect any structure exterior to the said bulk-head line, except the sea wall mentioned in the first section of this act." And these acts exhibit the policy of the legislature to have been, prior to the enactment of the law of 1870 and 1871, to exclude the permanent or even transient occupation of the waters of the slips, or beyond the bulk-heads, by structures of this description. And that policy has been maintained and followed with uniformity in the enforcement of the legislation of the State. (*People* v. *Vanderbilt*, 26 N. Y., 287; *Commissioners etc.*, v. *Clark*, 33 id., 251.)

Where it was said by DENIO, Ch. J., that "the language and the obvious policy of the statute is, that these piers and bulk-heads should be kept wholly clear of incumbrances, and it will not answer for parties permanently to engross portions of their area, and then ask a jury to speculate upon the degree of inconvenience which the public would suffer, and whether it was not fairly balanced by the advantage of the structure which constituted the incumbrance." (Id., 265.) And this rule of construction was also applied in *People* v. *Mallory* (46 How., 281). And so it was under this statute of 1871 in *Kingsland* v. *Mayor, etc.*, (45 Hun, 198; affirmed, 110 N. Y., 569). And this restrictive policy of the statute has been no farther departed from than by chapter 249 of the Laws of 1875, allowing sheds, under specified circumstances, to be erected on leased piers.

The fact that both the dock department and the city itself has

permitted ferry companies using other slips to be incumbered by structures of a similar description, both before and after the passage of this act of 1871, will not legalize this structure.   For the authority conferred upon the board was in no respect discretionary.   It was absolute and positive, forbidding the waters of the slips to be obstructed or incumbered by such a structure beyond the bulk-head line.   If they could be obstructed to the extent to which this structure has reached, the same authority would permit the waters of the slip to be wholly occupied, and the slip in that manner, for all practical purposes, destroyed.   And that certainly could not have been intended to be authorized by the legislature.   And, therefore, the action of the department of docks in permitting, or even sanctioning such erections, affords no legal foundation for permitting their maintenance, when, as in this case, an action has been brought to secure the removal of the offensive structure.   The provisions of the statute are imperative, rendering this an illegal obstruction of the waters of the slip.   Whether a ferry can be maintained under the application of this rule it is not necessary to inquire.   For if it cannot be, then further legislation for the relief of those enterprises may be required from the legislature.   Or, as was considered in *Jordan* v. *Metropolitan, etc. Company* (65 How., 255), the necessary buildings required for the convenient prosecution of the ferrying business may require to be extended into the street itself.   It is not, however, necessary now to express any opinion upon that subject.   For the disposition of this case, it is only necessary to observe and carry into effect these provisions of the law of 1871.

And under that act, as it has already been construed and enforced, the judgment recovered by the plaintiff is correct, and should be affirmed, with costs.

VAN BRUNT, P. J., concurred.

Judgment affirmed, with costs.